

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-13-00705-CR

Adam **AYALA**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 227th Judicial District Court, Bexar County, Texas
Trial Court No. 2013CR1053
Honorable Philip A. Kazen, Jr., Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:    Karen Angelini, Justice
    Sandee Bryan Marion, Justice
    Patricia O. Alvarez, Justice

Delivered and Filed:  September 3, 2014

AFFIRMED

Adam Ayala was convicted of possessing cocaine in an amount of four grams or more but less than two hundred grams. He appeals, arguing the trial court erred in denying his motion to suppress and his request for a jury instruction on a lesser-included offense. He also argues the trial court erred in overruling his chain-of-custody objection to the substance found on Ayala being introduced in evidence. We affirm the judgment of the trial court.

## BACKGROUND

The appellate record does not reflect that the trial court heard a pretrial motion to suppress. The only testimony in the record comes from the trial on the merits.

At trial, Ayala's mother, Sylvia Ayala, testified that on September 2, 2012, Ayala was "acting weird," like he was "hallucinating, walking along just like something [was] happening to him." According to Sylvia, Ayala claimed that "there were some people in the house," but there was not anyone else there. Sylvia testified she found Ayala's behavior to be alarming. She tried to reassure Ayala that "there was nothing wrong with him, that he was just hallucinating." Ayala then "stayed up all night" and called 9-1-1, claiming Sylvia needed help. Sylvia testified that the police responded to the call. Ayala told the police, "My mom needs help." Sylvia told the police that she did not need help–it was her son who needed help. Sylvia testified that EMS then arrived and checked Ayala. "They said they couldn't do anything because there was nothing wrong. The only thing was [that] he was hallucinating and he had to get rid [of] what was in his system." According to Sylvia, the police then took Ayala to the hospital: "The policeman told me that they were going to take him because he was hallucinating and saying there was somebody there, so they were going to take him to get help, because he needed some help."

Sylvia testified that Ayala was in the hospital for two days and came home on September 4, 2012. According to Sylvia, he then went into his bedroom, found a "little plastic bag," and began waving it around and telling Sylvia, "I'm going to take all this. I'm going to take all this." Sylvia testified that she told Ayala to dispose of the drugs in the toilet because she was not going to stay up all night with him again. Sylvia told Ayala that they needed to get him "some kind of help." But, Ayala was adamant that he was not going to dispose of the plastic bag of drugs. So, Sylvia called the police because she wanted to get "help for him," and she "couldn't help him." When the police arrived, she let them into the home. They talked to her in the living room and then went

outside to talk to Ayala. Ayala then came inside and retrieved the plastic bag of drugs from his bedroom.

At trial, Jerred Moeller, a patrol officer with San Antonio Police Department, testified that on September 4, 2012, he was dispatched to a home in San Antonio, Texas, for a call based on a disturbance. Officer Moeller testified, "I was sent by dispatch to handle a disturbance involving . . . a mother and a son regarding narcotics in the household and an argument that had ensued over these narcotics." When Officer Moeller arrived, the mother, Sylvia Ayala, "was upset, upset that she had to resort to calling the police to handle what she felt should have been a mother/son disturbance confrontation, situation as a whole." After speaking with Sylvia Ayala, Officer Moeller spoke with Ayala. He asked Ayala if he "had any narcotics in his possession." He also asked Ayala why he had been arguing with his mother. According to Officer Moeller, Ayala replied, "No, I don't have any narcotics on me. Go ahead and search me." Officer Moeller searched Ayala and did not find any narcotics. Officer Moeller testified that because Ayala was living in his mother's house, he and the other officer "continued to speak a little more after in regards to not only his alleged drug use, but also what needs to happen as a long-term solution." Officer Moeller told Ayala that the reason the police were there was "because his mother was upset–she felt he was using narcotics and had narcotics in her house and was upset that she would bring those or that he would bring those into the house, and she just wanted the situation resolved. She wanted any illegal narcotics out of her house." Officer Moeller asked Ayala "if he had any narcotics in his bedroom or stashed anywhere else in the house." According to Officer Moeller, Ayala "responded that he did have a 'baggie' in his bedroom." Officer Moeller asked Ayala what he had, and Ayala said "he had cocaine," but explained that he did not use cocaine–"[h]e only uses ice." Officer Moeller testified that Ayala said he had the cocaine "hidden in a gas mask in his bedroom in the closet." Officer Moeller asked Ayala if he would show them the cocaine. Officer Moeller testified that he

and Officer Hardeman followed Ayala "to his bedroom where he went and he recovered the gas mask," which was underneath some other items. Ayala "unscrewed the filter and pulled a baggie out of the gas mask." He then handed the baggie to Officer Moeller. Officer Moeller testified that he and Officer Hardeman did not coerce Ayala in any way to get into his bedroom. They did not threaten Ayala in any form or any fashion. Officer Moeller testified that Ayala was not in custody and that he did not view his conversation with Ayala as a custodial interrogation. According to Officer Moeller, when he asked Ayala if he had any narcotics in his room, Ayala said he did, but that the drugs did not belong to him. Ayala claimed "he couldn't get rid of it." He said it was "garbage cocaine," which according to Officer Moeller, usually means "it's been cut down with other agents so it's not as potent as pure cocaine." Officer Moeller testified the cocaine "looked like it had been in his room for a while or it had been in possession for a while. It had a strange color to it, not consistent with what we usually see." However, it "still had the right texture" for cocaine. Officer Moeller took the plastic baggie of cocaine. A field test of the substance in the plastic baggie was positive for cocaine. He then took the plastic baggie to the property room at the police station.

Robert Rodriguez, a forensic scientist with the Bexar County Crime Lab, testified that he analyzes pills, powders, plants, and paraphernalia for controlled substances. "Our protocol calls for three different tests. Two of them are presumptive. The first is just a simple color test, and what it does is narrow the range of the possible drug types by giving a distinct color for the different class of drugs. The second is thin layer chromatography, and the third is gas chromatography, mass spectrometry." With those tests, Rodriguez testified that he can identify what a given substance is. According to Rodriguez, the substance in the plastic baggie given by the police to the crime lab was positive for cocaine.

After hearing all the evidence, the jury found Ayala guilty of possession of cocaine of more than four but less than two hundred grams. Ayala was sentenced to six years of imprisonment and fined $2,500. He now appeals.

## MOTION TO SUPPRESS

In his first issue, Ayala argues the trial court erred in denying his motion to suppress. Ayala, however, did not preserve this error for appellate review. To preserve error for appeal, "the record must show that appellant made a timely request, objection, or motion, and that the trial court ruled on it." *Garza v. State*, 126 S.W.3d 79, 81-82 (Tex. Crim. App. 2004); *see* TEX. R. APP. P. 33.1(a)(1). "There are two main purposes behind requiring a timely, specific objection: (1) to inform the judge of the basis of the objection and give him the chance to make a ruling on it, and (2) to give opposing counsel the chance to remove the objection or provide other testimony." *Garza*, 126 S.W.3d at 82. "By affording the judge an opportunity to rule on an objection, he is able to decide whether the evidence is admissible." *Id.* "If the judge decides the evidence is inadmissible, the jury is shielded from hearing it." *Id.*

As a general rule, a motion to suppress will preserve error in the admission of evidence without further objection at trial if the motion is overruled by the court following a pretrial hearing. *Luu v. State*, No. 14-12-00665-CR, 2013 WL 4487564, at *2 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *see Garza*, 126 S.W.3d at 84 ("It is generally accepted that, when a court overrules a pretrial motion to suppress evidence, the defendant need not subsequently object to the admission of the same evidence at trial to preserve error.") (internal quotation marks omitted). But, when a trial court does not hold a pretrial hearing on the motion, the defendant must make a timely objection to the evidence when it is offered at trial in order to preserve error. *Luu*, 2013 WL 4487564, at *2.

Here, Ayala filed a pretrial motion to suppress before trial; however, the appellate record does not reflect that he ever presented his motion to the trial court or that the trial court held a pretrial hearing on his motion. There is no reporter's record of a pretrial hearing. The trial court's docket sheet does not reflect a pretrial hearing. The reporter's record of the trial on the merits does not reflect that Ayala presented his motion to suppress before the trial on the merits began. Further, at trial, Ayala made no objection when the State introduced the evidence he now complains should have been suppressed. When the State rested its case, defense counsel stated that he "would like to *renew* [his] motion to suppress–the fact that the officer questioned my client, asked him specific statements, interrogating him without administering the *Miranda* warnings." (emphasis added). Although defense counsel stated he was renewing his motion to suppress, there is simply nothing in the appellate record to indicate that he presented his motion to the trial court and received a ruling before the State presented its evidence to the jury. Thus, Ayala has failed to preserve this issue for appellate review.

## LESSER-INCLUDED JURY INSTRUCTION

In his second issue, Ayala argues the trial court should have granted his request to instruct the jury on the lesser-included offense of possessing a smaller amount of cocaine. A defendant is entitled to the submission of a lesser-included offense if a two-pronged test is met: (1) the lesser-included offense must be included within the proof necessary to establish the offense charged, and (2) some evidence must exist in the record that would permit a rational jury to find that if the defendant is guilty, he is guilty only of the lesser offense. *Solomon v. State*, 49 S.W.3d 356, 368-69 (Tex. Crim. App. 2001).

Here, Ayala was charged with possessing a controlled substance in "Penalty Group 1." A person commits the offense of possessing a controlled substance in Penalty Group 1 if he "knowingly or intentionally possesses a controlled substance listed in Penalty Group 1, unless the

person obtained the substance directly from or under a valid prescription or order of a practitioner acting in the court of professional practice." TEX. HEALTH & SAFETY CODE ANN. § 481.115(a) (West 2010). Ayala was charged with possessing an amount of one gram or more, but less than four grams in accordance with section 481.115(c) of the Texas Health and Safety Code. He argues that the trial court should have instructed the jury on the lesser-included offense of possessing an amount less than one gram in accordance with section 481.115(b). Because the offense of possessing a smaller amount is included within the proof necessary to establish the offense charged, the first prong of the test is met in this case. *Compare* TEX. HEALTH & SAFETY CODE ANN. § 481.115(b) (West 2010), *with id.* § 481.115(c). Thus, the issue in this appeal is whether the second prong of the test is met.

"In considering whether there is some evidence in the record that a defendant, if guilty, is guilty only of the lesser offense, it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense." *Solomon*, 49 S.W.3d at 369 (citation omitted). "Rather, there must be some evidence directly germane to a lesser-included offense for the factfinder to consider before an instruction on a lesser-included offense is warranted." *Id.* "The evidence must establish the lesser-included offense as a valid rational alternative to the charged offense." *Wesbrook v. State*, 29 S.W.3d 103, 113 (Tex. Crim. App. 2000).

As evidence that he was only guilty of the lesser-offense, Ayala points to the testimony of Officer Moeller who testified that the white powder in the plastic baggie had "a strange color" and was not consistent with what he usually sees. Ayala also points to Rodriguez's testimony that the powder was "a dark, sandy substance, and it was sampled twice because normally the cocaine [he tests] is powder or wax-like . . . and this had other stuff in it." Ayala argues that from this testimony a rational juror could conclude that he possessed less cocaine than Rodriguez testified was in the plastic baggie.

However, the definition of a "controlled substance" includes adulterants and dilutants. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.002(5) (West Supp. 2014) ("'Controlled substance' means a substance, including a drug, *an adulterant, and a dilutant*, listed in Schedules I through V or Penalty Groups 1, 1-A, or 2 through 4.") (emphasis added). "Controlled substance" "*includes the aggregate weight of any mixture, solution, or other substance containing a controlled substance*." *Id.* (emphasis added). Further, subsections 481.115(b) and (c) of the Texas Health and Safety Code make clear that whether the offense is a state jail felony or a third-degree felony depends on "the amount of the controlled substance possessed" "by aggregate weight, *including adulterants or dilutants*." *See* TEX. HEALTH & SAFETY CODE ANN. § 481.115(b), (c) (West 2010) (emphasis added).

"'Adulterant or dilutant' means any material that increases the bulk or quantity of a controlled substance, regardless of its effect on the chemical activity of the controlled substance." *Id.* § 481.002(49) (West Supp. 2014). Although, as pointed out by Ayala, Rodriguez did testify that the plastic baggie included substances other than cocaine–namely, benzocaine, caffeine, and tetramisole. Rodriguez was clear that these substances were "adulterants." He testified that "[b]enzocaine is an anesthetic." "It sort of like numbs–has the same effect as cocaine." "Caffeine is a stimulant, which also has the same effect as cocaine." "Tetramisole is something that we–that they first started seeing, like, in 2002. It was used in veterinary medicine. We still don't understand why they are using the tetramisole. They have used it in medicine to–for cancer research, but they were having difficulties with that. Adulterants are added to the powder substance strictly for economic value, increase the bulk and also gain some weight to it."

Ayala argues that Rodriguez's testimony that "we still don't understand why they are using the tetramisole" is evidence that Ayala could have committed the lesser-included offense of possessing a smaller amount. We disagree. Rodriguez was clear that tetramisole was an adulterant,

and according to the Texas Health and Safety Code the adulterant's "effect on the chemical activity of the controlled substance" is immaterial. *See id.* § 481.002(49). We therefore conclude that there is no evidence that would permit a rational jury to find that if Ayala was guilty, he was guilty only of the lesser-included offense.

## CHAIN OF CUSTODY

In his final issue, Ayala argues the trial court erred in overruling his chain-of-custody objections to State's Exhibits 2 and 3. State's Exhibit 2 was an envelope that contained another envelope, and State's Exhibit 3 was the second envelope with the actual plastic baggie of cocaine inside it. We review the trial court's decision to overrule Ayala's objection and admit State's Exhibits 2 and 3 in evidence for abuse of discretion. *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g).

Although the Texas Rules of Evidence do not specifically define the term "chain of custody," Rule 901(a) does state that "[t]he requirement of authentication or identification as a condition precedent to admissibility purposes is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." TEX. R. EVID. 901(a); *see Dossett v. State*, 216 S.W.3d 7, 17 (Tex. App.—San Antonio 2006, pet. ref'd). "Evidence may be authenticated or identified by different methods, including testimony by a witness with knowledge that 'a matter is what it is claimed to be.'" *Dossett*, 216 S.W.3d at 17 (quoting TEX. R. EVID. 901(b)(1)). A trial court does not abuse its discretion by admitting evidence based on a belief that a reasonable juror could find that the evidence has been authenticated or identified. *Id.* And, proof of chain of custody goes to the *weight of the evidence, rather than its admissibility*. *Id.* Proof of the beginning and end of a chain of custody will support the admission of the evidence in the absence of any evidence of tampering or alteration. *Id.* Thus, gaps or theoretical breaches in the chain of custody do not affect the admissibility of the evidence, absent affirmative evidence of

tampering or commingling. *Id.* The State has no burden to disprove tampering or commingling; rather, the appellant has the burden to present affirmative evidence of tampering or commingling. *Id.* And, a showing of the possibility of tampering or commingling is not sufficient to bar admission of the evidence, and goes only to the weight of the evidence. *Id.*

At trial, Officer Moeller testified that he took the plastic baggie of cocaine from Ayala. According to Officer Moeller, protocol then required a crime scene investigator or detective to perform a field test of the alleged narcotics at the scene to see if the substance tests "positive for what it is believed to be." Officer Moeller testified that he requested a crime scene investigator to come to the scene. That investigator took a small sample from the plastic baggie. Officer Moeller testified this field test of the substance "was positive for cocaine." According to Officer Moeller, the plastic baggie remained in his possession until he took it to the property room. Officer Moeller testified that after the substance was placed in the property room, the department has a "system" where the property is logged into a computer program. Officer Moeller testified, "It's given a specific property tag number or we also have K tags, which can be used for narcotics, which is a paper tag system. It's still given a tag number. It's still noted in our police reports, and then it's placed in a secure narcotics locker, in this case which cannot be accessed by police personnel, only by property room personnel." The envelope with the tag on it is sealed. "It can either be sealed with evidence tape or just with the glue strip just so it's identifiable that the envelope hasn't been opened."

At trial, Officer Moeller was handed State's Exhibit 2, an envelope that Officer Moeller testified he took from the property room. Officer Moeller testified that the evidence tag number for this case was 134750, and the case number was SAPD 12200328. Officer Moeller testified that the K tag number was the same as the case number, 12200328. "When we use the K tags, because it's an old system, because it's a paper system, the property room, once they receive that, they

actually put an electronic tag on it so it can be tracked later on, so the K tag number may be inside the envelope, but it's not on the exterior."

Officer Moeller testified that State's Exhibit 2, the envelope he took from the property room, was sealed. On the envelope was the case number 12200328 and the date September 4, 2012, the same date he took the plastic baggie from Ayala. Officer Moeller then opened State's Exhibit 2 and pulled out another envelope, which was also sealed with evidence tape. Within it was State's Exhibit 3, the plastic baggie of cocaine. Officer Moeller testified that "[i]t's the baggie that was in Mr. Ayala's possession. Cocaine." Officer Moeller clarified that State's Exhibit 2 was "the envelope that the narcotics were placed in prior to being put in the locker," and State's Exhibit 3 was "the baggie in the envelope with [his] badge number and initials on it, as well as the weight [noted] on the envelope."

Robert Rodriguez, a forensic scientist at the Bexar County Crime Lab, testified that he recognized State's Exhibit 2, which had his initials and the date on which he completed the test for controlled substances on the substance inside the envelope. Rodriguez testified, "What was inside this container was this other container, which contained the substance that was analyzed and, of course, it's also been dated, initialed, and our identifier number, and it's also been sealed again with identifier with my initials and the date." Rodriguez testified that he knew he was the one who performed the test because of his initials and the date. Once he completed the tests, he resealed the envelope with the Crime Lab's tape.

According to Rodriguez, State's Exhibit 2 was brought to the Crime Lab in a sealed envelope by A.C. Leal of the San Antonio Police Department. A.C. Leal gave it to Louie Frausto, one of the Crime Lab's technicians, who put one of the Crime Lab's "identifier number" on it and placed it in the vault. State's Exhibit 3 was sealed when the Crime Lab received it and brought to the Crime Lab "on September 10, 2012, at approximately 12:01 p.m." Rodriguez testified that the

sealed State's Exhibit 3 "was first opened up on January 8, [2013], and it was identified as a manila envelope containing – Ziploc bag containing alleged cocaine." Rodriguez noted the unusual color of the substance. He testified that on January 8, 2013, he conducted all three tests on the substance, which were positive for cocaine.

On appeal, Ayala complains that the State's chain of custody "falls apart" because Officer Moeller testified that the evidence tag number was 134750 and that this number was "conspicuously absent from either Exhibit 2 or 3 and the record lacks any explanation as to why that number would be missing from the evidence." He points out that Officer Moeller testified he did not see that number on either exhibit. However, the record reflects that Officer Moeller testified that there are "two systems" and two tags: one paper and one electronic. The paper tag in this case was 134750. However, once the property room received the evidence, the envelope was given an electronic tag so that it could be tracked.

During Rodriguez's testimony, defense counsel objected to the tag number not being on State's Exhibit 2. Rodriguez clarified that there were two envelopes. The larger envelope, State's Exhibit 2, "comes from the SAPD evidence people," and the smaller envelope within the larger one, which Rodriguez described "as a small manila envelope containing one Ziploc bag containing alleged cocaine," was "the actual envelope submitted by Officer Moeller." This "second container" had Officer Moeller's initials on it.

We agree with the State that there was proof of the beginning and the end of the chain of custody, and there is no evidence of tampering or alteration. *See Dossett*, 216 S.W.3d at 17. Officer Moeller identified the substance in State's Exhibit 3 as the substance he took from Ayala. He noted that the case number, his initials, and the date were on State's Exhibit 3. He also noted its unusual color. Rodriguez, the forensic scientist, also identified State's Exhibit 3 and testified the substance inside it was positive for cocaine. He testified the officer's initials and date of arrest were on the

envelope. Like Officer Moeller, Rodriguez noted the substance's unusual color. We agree with the State that Ayala's argument goes to the weight of the evidence, and not to its admissibility. *See id.* Therefore, we hold the trial court did not abuse its discretion in admitting the evidence. *See id.*

We affirm the judgment of the trial court.

Karen Angelini, Justice

Do not publish